IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

LAURA F.,

                          Plaintiff,

          vs.

KILOLO KIJAKAZI, Acting Commissioner of
Social Security,

                          Defendant.

8:23CV272

MEMORANDUM AND ORDER ON
JUDICIAL REVIEW OF
COMMISSIONER'S DENIAL OF
BENEFITS

Laura F.[1] seeks judicial review of the denial by defendant Commissioner of the Social

Security Administration of her application for disability insurance benefits and supplemental

security income for mental and physical impairments. Filing 13-2 at 28 (AR 27). Laura F. seeks

an order either reversing the Commissioner's decision or vacating and remanding the

Commissioner's decision for further proceedings. Filing 1 at 3; Filing 24 at 1. In response, the

Commissioner moved to affirm the Commissioner's final decision denying Laura F. disability

insurance benefits and supplemental security income. Filing 13-2 at 8 (AR 7). For the following

reasons, the Court grants the Commissioner's motion to affirm and denies Laura F.'s motion to

reverse.

## I.  INTRODUCTION

### A.  Procedural Background

On April 23, 2021, Laura F. filed both a Title II application for a period of disability and

disability insurance benefits and a Title XVI application for supplemental security income. Filing

---

[1] The Court will refer to Plaintiff by first name and first initial of last name to protect her privacy.

13-2 at 11 (AR 10); Filing 1 at 2; Filing 18 at 3. In both applications, Laura F. identified December 24, 2020, as the onset date for her disabilities. Filing 13-2 at 11 (AR 10); Filing 18 at 4, 6. Both applications were denied initially on October 1, 2021, and denied upon reconsideration on February 16, 2022. Filing 13-2 at 11 (AR 10); Filing 18 at 3. Laura F. then requested an ALJ administrative hearing on March 24, 2022, which was held on August 2, 2022. Filing 13-2 at 11 (AR 10); Filing 1 at 2; Filing 18 at 3. *See* 20 C.F.R. § 416.1429 (explaining that under 20 C.F.R. § 416.1430, claimant may request a hearing following a decision or determination made, such as a denial after reconsideration). An online video hearing was held on August 2, 2022. Filing 13-2 at 41, 43 (AR 40, 42). The ALJ issued his decision on August 24, 2022, denying Laura F. both disability insurance (DI) and social security insurance (SSI) benefits. Filing 13-2 at 28 (AR 27); Filing 18 at 3, 17; Filing 1 at 2. In response to Laura F.'s request for review, the Appeals Council denied review on April 19, 2023. Filing 1 at 2; Filing 18 at 3, 17; Filing 13 at 2 (AR 1).

Laura F. then filed a timely request for judicial review on June 20, 2023. Filing 1. Laura F. requests that the Court reverse the ALJ's decision on three grounds: (1) the ALJ did not articulate sufficient reasons why he found Ms. Millemon's medical opinion only "partially persuasive" concerning Laura F.'s physical limitations; (2) the ALJ did not fully and fairly develop the record because the residual functional capacity (RFC) lacks sufficient medical support relating to Laura F.'s mental limitations; and (3) the ALJ's decision is invalid because the ALJ was not constitutionally appointed at the time of the hearing. Filing 18 at 2-3; *see* Filing 13-2 at 25 (AR 24) (stating that the ALJ finds Ms. Millemon's opinions "partially persuasive").

**B. Factual Background**

*1. The Claimant and the Alleged Disabilities*

Laura F. was fifty-two years old at the alleged disability onset date of December 24, 2020, classifying her as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d) and 20 C.F.R. § 416.963(d). Filing 13-3 at 12 (AR 79). Laura F. has a high school education, placing her in the "high school education and above" classification of educational ability under 20 C.F.R. § 416.964(b)(4) and 20 C.F.R. § 404.1564(b)(4), thereby indicating that she can do semi-skilled or skilled work. Filing 11-2 at 306, 404, 454; Filing 13-6 at 17 (AR 268). Laura F., divorced for approximately eighteen years, lived alone at the time of her alleged disability onset date. Filing 13-2 at 52 (AR 51). Laura F.'s last date of employment was December 24, 2020. Filing 13-2 at 47 (AR 46). She alleges that she has multiple impairments, but the ones at issue are her mental limitations as a result of receiving electroconvulsive therapy (ECT) treatments for her recurring depression disorder and her physical limitations from her fibromyalgia. Filing 18 at 2-3.

Laura F. has been diagnosed with depression since her youth. Filing 11-1 at 298, 304 (AR 672, 678). To treat her chronic depression, Laura F. has taken various medications. *See* Filing 11-1 at 352 (AR 726) (stating a non-exhaustive list of medications prescribed to Laura F. for her depression). Additionally, she receives ECT treatments. Filing 11-1 at 456, 527 (AR 830, 901). Laura F. began ECT treatments around late October or early November of 2020. Filing 11-1 at 149, 358, 456 (AR 523, 732, 830). While the initial frequency of these treatments fluctuated, eventually Laura F. received treatment once every three weeks then once every five weeks. Filing 13-2 at 51-52 (AR 50-51); Filing 12-1 at 209, 210, 214, 217, 220, 223, 226, 229, 232, 235,

238, 241, 244, 247, 250, 253, 256, 259 (AR 1152, 1153, 1157, 1160, 1163, 1166, 1169, 1172, 1175, 1178, 1181, 1184, 1187, 1190, 1193, 1196, 1199, 1202). *See* Filing 18 at 8-9 (explaining reasons for gaps in treatment as due to a diagnosis of likely COVID, pneumonia, or flu during late February to early March of 2021).

Laura F. was diagnosed with fibromyalgia around January 6, 2021. Filing 11-1 at 119 (AR 493). At that time, she was taking gabapentin and Mobic for the pain. Filing 11-1 at 119 (AR 493). Laura F. was also prescribed tramadol for her pain. Filing 11-1 at 26, 114, 119 (AR 400, 488, 493). Laura F. claims that her physical impairments include being able to sit or stand for limited intervals: she cannot exceed ten to fifteen minutes of standing and walking nor twenty minutes of sitting. Filing 13-6 at 67, 71 (AR 318, 322); Filing 13-2 at 56 (AR 55); Filing 11-1 at 514 (AR 888). To assist her balance while standing and walking, she sometimes uses a cane, though this cane was not medically prescribed. Filing 13-6 at 73 (AR 324); Filing 13-2 at 52, 57 (AR 51, 56).

Although Laura F. lives alone, her boyfriend of eight years, daughter, and son live nearby. Filing 13-2 at 52 (AR 51). Her boyfriend and daughter check-in on her and assist her with showering, some shopping, lifting of items, and some cooking. Filing 13-2 at 21, 52 (AR 20, 51); Filing 13-6 at 26 (AR 277). Other than this assistance, Laura F. drives herself to various appointments, prepares her own meals, cares for her cat, waters her flowers, checks the mail, and shops once or twice a week. Filing 13-2 at 52 (AR 51); Filing 13-6 at 35, 37 (AR 286, 288).

As mentioned above in § I.A., in support of her motion to reverse the Commissioner's denial of disability benefits and social security income, Laura F. asserts three grounds for the Court's consideration. Filing 18 at 2-3. First, the ALJ did not articulate sufficient reasons for

finding the consultative examiner opinions of Ms. Millemon only "partially persuasive" concerning Laura F.'s physical limitations. Filing 18 at 2; *see* Filing 13-2 at 25 (AR 24) (stating that the ALJ finds Ms. Millemon's opinions "partially persuasive"). Second, the ALJ did not fully and fairly develop the record because the residual functional capacity (RFC) he found lacks sufficient medical support relating to Laura F.'s mental limitations. Filing 18 at 2-3. Third, the ALJ was not constitutionally appointed at the time of the hearing, and therefore the ALJ's decision is invalid. Filing 18 at 3. This Court's further discussion of the factual background will focus on the medical records and determinations related to the first two grounds.

### 2. *Medical Records and Evidence*

#### a. Treating Physicians' Opinions of Laura F.'s Mental and Physical Impairments

Over the course of her treatment for her physical and mental impairments, Laura F. engaged a variety of doctors and physicians. First, Laura F.'s primary care doctor is Christy Ott, PAC. Filing 11-1 at 508 (AR 882). Ms. Ott prescribes and refills Laura F.'s medications, including the tramadol Laura F. uses for pain relief. Filing 11-1 at 114, 525 (AR 488, 899). Ms. Ott noted that Laura F. has ongoing pain in her knees, hands, feet, and left side of her back. Filing 11-1 at 524 (AR 898). Additionally, Ms. Ott noted that despite Laura F.'s severe depression, Laura F. appears "alert, and orient to person, place, and time" during examinations. Filing 11-1 at 523-24, 526-28 (AR 897-98, 900-02).

Laura F. went to Dr. Timothy Burd, M.D., in April 2021 to evaluate her back pain. Filing 11-1 at 71 (AR 445). Dr. Burd described Laura F.'s pain as "[i]ncreased pain with extension of the lumbar spine [and] [s]lightly increased pain with internal and external rotation of her left leg as well as with trying to get her left leg into a Faber's position." Filing 11-1 at 74 (AR 448). Dr.

5

Burd stated that Laura F. was to do aqua therapy and would obtain an MRI if her back pain did not improve. Filing 11-1 at 74 (AR 448).

Laura F. saw a psychiatrist, Dr. William Marcil, M.D., to assist with her depression and anxiety. Filing 13-6 at 20 (AR 271). Dr. Marcil prescribed many medications over the course of Laura F.'s treatment including the following: gabapentin, hydroxyzine, and trazadone. Filing 13-6 at 56-57 (AR 307-08). Laura F. asserts that she would see Dr. Marcil monthly, every two weeks, or every two months "depend[ing] on how things [were] going at the time." Filing 13-2 at 51 (AR 50). Dr. Marcil noted—in contradiction to Laura F.'s subjective claims—that Laura F.'s memory was "grossly intact" and her thought processes were organized during the time Laura F. was receiving ECT treatments. Filing 11-1 at 331, 335, 338 (AR 705, 709, 712).

Laura F. received ECT treatments from Dr. Arun Sharma, M.D. Filing 13-6 at 95 (AR 346). *See* Filing 18 at 6 (discussing that Laura F. received ECT treatments from Dr. Hasnain Sadiq, M.D., Dr. Roberto Cervantes, M.D., and Dr. Arun Sharma, M.D., but stating that her continued treatments in 2021 were with Dr. Sharma). The frequency of these treatments varied in the beginning, but for a period of time, Laura F. received treatment once every three weeks. Filing 13-2 at 52 (AR 51).

Laura F. underwent a consultative psychological examination by Amanda Millemon, P.A., during September of 2021. Filing 11-1 at 507 (AR 881). The examination notes report Laura F. had a "full range of motion" throughout her knees with an "absence of redness or swelling of any joints." Filing 11-1 at 513 (AR 887). Furthermore, Ms. Millemon found Laura F.'s sensation intact and full strength in her bilateral upper and lower extremities aside from a 4.5/5 grip strength and a decreased range of motion due to tenderness in her lumbar spine. Filing

11-1 at 513 (AR 887). During the examination, Laura F. did not use an assistive device to walk nor did she display "difficulty getting on and off the exam table." Filing 11-1 at 512 (AR 886). Despite these notes, Ms. Millemon concluded that Laura F. has many limitations including limitations with being able to stand and walk for no more than ten to fifteen minutes at a time and that she can only sit for twenty minutes at a time. Filing 11-1 at 514 (AR 888).

      b.   Self- and Lay-Assessments of Laura F.'s Functionality

Laura F. completed a function report for use by the Social Security Administration in considering her application for disability benefits and supplemental security income on June 10, 2021. Filing 13-6 at 41 (AR 292). Laura F. asserts several reasons why her physical and mental impairments impact her ability to work in her June 2021 function report. Physically, Laura F.'s side effects from her medication include sleepiness, dry mouth, dizziness, upset stomach, weight gain, headaches, kidney stones, bloody noses, itchy legs, and constipation. Filing 13-6 at 41-42 (AR 292-293). Additionally, she experiences limitations while lifting, squatting, bending, standing, reaching, and climbing stairs. Filing 13-6 at 39 (AR 290). She states that she cannot kneel and cannot walk or sit for long periods of time. Filing 13-6 at 39 (AR 290). Furthermore, she states her hands "don't work very well." Filing 13-6 at 34 (AR 285). Mentally, Laura F. asserts that she has trouble concentrating and has a bad memory. Filing 13-6 at 39 (AR 290). While she can follow written instructions, she cannot follow spoken instructions. Filing 13-6 at 39 (AR 290). Despite these physical and mental limitations, Laura F. states she can prepare her own meals, drive herself places, check the mail, care for her cat, water her flowers, and watch television. Filing 13-6 at 35, 37 (AR 286, 288). Additionally, Laura F. can take care of her own personal needs, grooming, and medication without reminders, though with some difficulty.

Filing 13-6 at 35-36 (AR 286-287). Laura F. also states that she shops once or twice a week, she goes out alone, spends times with others daily to weekly, and she tries to go outside daily. Filing 13-6 at 37-38 (AR 288-289). Furthermore, she does not have challenges handling money. Filing 13-6 at 37 (AR 288).

Laura F.'s daughter completed a function report on June 9, 2021, on behalf of Laura F. regarding limitations to Laura F.'s physical and mental abilities. Filing 13-6 at 25 (AR 276). She asserts that Laura F. has several physical and mental limitations. Specifically, she stated that Laura F. has limitations lifting, bending, standing, sitting, stair climbing, and using her hands. Filing 13-6 at 30 (AR 281). Furthermore, Laura F. cannot squat or kneel. Filing 13-6 at 30 (AR 281). Due to these physical limitations, the daughter assists Laura F. with some household tasks like carrying the laundry basket and grabbing the vacuum. Filing 13-6 at 27 (AR 278). The daughter asserts that Laura F. has short-term memory problems, has trouble completing tasks, can concentrate for fifteen to thirty minutes at a time, and has trouble following spoken instructions but not written instructions. Filing 13-6 at 30 (AR 281). Despite these physical and mental limitations, the daughter explains that Laura F. can perform light housework, watch television in a recliner daily, care for her cat, go outside daily, engage in recreational activities, and can handle money. Filing 13-6 at 26, 28-29 (AR 277, 279-280). Furthermore, the daughter asserts that Laura F. is autonomous when it comes to preparing meals, feeding herself, using the toilet, taking her medications, and driving herself. Filing 13-6 at 26-28 (AR 277-279).

Laura F. completed another function report in November of 2021 which contained changes from her June 2021 report. Filing 13-6 at 74 (AR 325). The November report affirmed that Laura F. does not need reminders to take care of her personal needs, grooming, and

medication. Filing 13-6 at 69 (AR 320). However, she wrote she does need assistance completing her personal needs and grooming, and that she uses a pill dispenser for medication. Filing 13-6 at 69 (AR 320). She added that it had become more difficult to follow spoken instructions, reiterating that written instructions were helpful. Filing 13-6 at 72 (AR 323). Another change from the June 2021 report is Laura F. stated she can no longer function in public because of her depression and anxiety. Filing 13-6 at 67 (AR 318). She clarifies that her challenges of functioning in public pertain to "big groups of people," given she continues to spend time with others weekly if not daily. Filing 13-6 at 71 (AR 322). While she still goes shopping once a week, she has a friend help her get cat food and cat litter so that she can continue to care for her cat. Filing 13-6 at 68 (AR 319). Another change asserted is her attention span decreased to five minutes. Filing 13-6 at 72 (AR 323). An additional change was her list of medication side effects expanded to now include dry eyes, having no memory, and having racing heart and thoughts. Filing 13-6 at 72, 74 (AR 323, 325). Despite these changes, Laura F. continues to watch television daily and care for her plants and flowers weekly. Filing 13-6 at 71 (AR 322).

Laura F.'s daughter completed a second function report on November 3, 2021, on behalf of Laura F. regarding limitations to Laura F.'s physical and mental abilities. Filing 13-6 at 80 (AR 331). This November report reiterates what the daughter said in the report from June 2021 with some changes. First, the daughter asserts that Laura F. now needs assistance bathing and "preparing a big meal." Filing 13-6 at 81-82 (AR 332-333). Second, the daughter asserts that Laura F. becomes dizzy easily and is unable to stand for long periods of time. Filing 13-6 at 83 (AR 334). Third, the daughter asserts that Laura F. has short-term memory problems. Filing 13-6

at 30 (AR 281). Despite these limitations, the daughter explains that Laura F. can still perform light housework, watch television daily, care for her cat, care for her houseplants, and can handle money, though she needs "encouragement to perform" some of these tasks. Filing 13-6 at 81-84 (AR 332-335). Furthermore, the daughter reiterates that Laura F. is autonomous when it comes to feeding herself, using the toilet, taking her medications, and driving herself. Filing 13-6 at 83 (AR 334).

c.   Evaluations of Laura F.'s Medical History by State Consultants

Concerning Laura F.'s physical impairments, treatment notes indicate she had experienced some side effects over the course of adjustments to medications and dosages, although these notes do not reveal as exhaustive of a list as Laura F. gave herself. Filing 11-1 at 83, 231, 294, 298, 310, 314 (AR 457, 605, 668, 672, 684, 688); Filing 13-6 at 74 (AR 325). Based on these notes in the record, the state agency psychological consultants found Laura F. had "no more than a moderate [physical] limitation." Filing 11-1 at 83, 231, 294, 298, 310, 314 (AR 457, 605, 668, 672, 684, 688).

Concerning Laura F.'s mental impairments, the state agency psychological consultants found—upon review of the record both initially and during reconsideration—were mild and moderate limitations in her thought processes. Filing 13-3 at 5, 27 (AR 72, 94). This finding aligns with the notes from Laura F.'s psychiatrist and primary care physician that her memory is "grossly intact" and her "thought processes [are] organized." Filing 11-1 at 490-491 (AR 864-865). Likewise, the state agency psychological consultants found a mild limitation concerning Laura F.'s anxiety out in public following the June 2021 functional report, in part because her depression and anxiety symptoms were improving. Filing 13-3 at 28, 30 (AR 95, 97). Following

10

the November 2021 functional report, the state agency psychological consultants again found that Laura F. had mild and moderate mental limitations as well as continued improvement of her depression and anxiety symptoms. Filing 13-3 at 38-39 (AR 105-106).

        d.   Laura F.'s Personal Testimony at the ALJ Hearing

On August 2, 2022, Administrative Law Judge Chris Yokus held a hearing to review the Commissioner's denial of Laura F.'s application for disability insurance benefits and supplemental security income benefits. Filing 13-2 at 41, 43 (AR 40, 42). Laura F. appeared at the hearing via online video and was represented by her attorney. Filing 13-2 at 43 (AR 42). Laura F. stated she had not worked since 2020. Filing 13-2 at 47 (AR 46). Laura F. explained that for the fifteen years prior to 2020, she worked primarily as a waitress and cashier but held other jobs including a helper and receptionist in a veterinarian office. Filing 13-2 at 48 (AR 47).

When discussing her physical impairments, Laura F. asserted that the gabapentin and Lyrica she takes for her fibromyalgia helps "not very much. A little." Filing 13-2 at 49 (AR 48). When asked if there is a plan to alter her treatment, Laura F. states that her rheumatologist changes dosage as well as changes medication but that overall "there's nothing he's really done for [her fibromyalgia]." Filing 13-2 at 49 (AR 48). Laura F. admits that although her rheumatologist recommends exercise, she cannot do these exercises because her back seizes up, causing her to "take a few steps at a time . . . maybe 10 steps at most at once." Filing 13-2 at 50 (AR 49). When asked how long Laura F. has experienced this walking difficulty, she stated "two, two and a half years" with the difficulty "g[etting] worse." Filing 13-2 at 50 (AR 49).

When asked how she was able to work as a waitress during this period of walking difficulty, Laura F. answered that her two doses of tramadol a day with Tylenol intermittently

gave her relief. Filing 13-2 at 50 (AR 49). However, Laura F. volunteered that the Tylenol "doesn't do anything" for her back pain and walking difficulty. Filing 13-2 at 50 (AR 49). This back pain also impacts her ability to sit in the car on road trips and her ability to sit during plane rides. Filing 13-2 at 53-54 (AR 52-53). Related to her back pain, Laura F. stated she had surgery to fuse two vertebrae in her back "several years ago" when she was about "10 years younger" but has not felt relief. Filing 13-2 at 54 (AR 53). As of the hearing date, she was to receive an epidural soon to alleviate her back pain. Filing 13-2 at 54 (AR 53).

Aside from her back pain, Laura F. asserts other physical impairments including "a burning, throbbing pain" in the joints in her hands, balls of the feet, heels, and ankles. Filing 13-2 at 55 (AR 54). She describes the pain in her nerve endings as "extremely painful." Filing 13-2 at 55 (AR 54). This pain impacts her ability to stand or walk "for very long" as well as do "tedious little stuff" with her hands like cross stitch and paint. Filing 13-2 at 55 (AR 54). Laura F. also asserts that she has had eight knee surgeries but is currently holding off on a replacement. Filing 13-2 at 56 (AR 55). Her knee pain makes it difficult to stand and walk. Filing 13-2 at 56 (AR 55). Her knees also swell full of fluid below the kneecaps down to the tops of the shins. Filing 13-2 at 57 (AR 56).

Laura F. asserts that her physical impairments impact her ability to work. Filing 13-2 at 55 (AR 54). Her back pain affects her attendance at work, which led to her losing employment at Walmart. Filing 13-2 at 51 (AR 50). The pain in her hands makes it challenging for her to "grasp[ ] and hold[ ] [pens]" which precluded her from writing orders down in her former job as a waitress. Filing 13-2 at 55, 58 (AR 54, 57). In total, Laura F. estimates that she cannot stand for more than ten minutes without having to sit or recline for a few minutes before she can resume

standing "to get the pressure off [her] back." Filing 13-2 at 56 (AR 55). She estimates that she sits with a heating pad on her back three, four, or five times a day. Filing 13-2 at 62 (AR 61). Furthermore, she cannot lift more than ten pounds at a time. Filing 13-2 at 58 (AR 57).

Laura F. volunteers that she receives alternating help from her boyfriend and her daughter to lift objects heavier than ten pounds. Filing 13-2 at 59 (AR 58). They also assist her when showering because she experiences vertigo from her medications when she tilts her head "back or down." Filing 13-2 at 52-53 (AR 51-52). She does not experience this vertigo when she drives, so she drives herself to doctor appointments and to stores. Filing 13-2 at 52-53 (AR 51-52). The only other physical assistance Laura F. discusses is a cane she uses to keep her balance when she walks. Filing 13-2 at 57 (AR 56).

When discussing her mental impairments, Laura F. testified to having "really bad" memory. Filing 13-2 at 48 (AR 47). She attributes this enduring memory loss to her ECT treatments she receives for her depression. Filing 13-2 at 48, 59, 63 (AR 47, 58, 62). In response to the question of whether her ECT treatments are complete, Laura F. asserts that she will need to continue her ECT treatments "probably for several years." Filing 13-2 at 51 (AR 50). She further elaborates that there has been an irregular pattern of ECT treatments since she began treatments three times a week for three months, then switched to once a week, then once every two weeks, followed by a period of once every three weeks, then once a month. Filing 13-2 at 51-52 (AR 50-51). She states that although the ECT treatments have been helpful her depression is "still bad." Filing 13-2 at 59-60 (AR 58-59); Filing 11-1 at 226 (AR 600). She describes her depression as her stress and anxiety being "wound up" and "building," making her feel "numb inside" and that "there's no reason to get out of bed." Filing 13-2 at 59-60 (AR 58-59). From her

depression, she "can't deal with people" and "can't go to crowds" of more than ten people without feeling like she "can't breathe." Filing 13-2 at 60 (AR 59). Furthermore, the lack of funds from being unable to work gives her "horrible, horrible, horrible anxiety[.]" Filing 13-2 at 61 (AR 60).

Laura F. answered affirmatively that her mental impairments impact her ability to work because getting "so many tasks done in a certain amount of time" increases her anxiety and depression. Filing 13-2 at 61 (AR 60). To cope with this anxiety and depression, she would either leave work to "take a Xanax or something" to then return to work or she would not show up for work. Filing 13-2 at 61 (AR 60). Her unpredictable attendance led to her losing her job "pretty much all the time." Filing 13-2 at 61 (AR 60).

   *3. The ALJ's Impairment Findings*

To determine whether a claimant is disabled, an ALJ follows the five-step analysis set forth in 20 C.F.R. § 404.1520(a)(4) and 20 C.F.R. § 416.920(a)(4). *See Grindley v. Kijakazi*, 9 F.4th 622, 628 (8th Cir. 2021) (citing *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012)). The five steps are as follows:

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Grindley*, 9 F.4th at 628 (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004)). The analysis is complete if the ALJ finds the claimant "not disabled" in step one, two, or four; if the ALJ finds the claimant "disabled" in step three; or finds the claimant is either "disabled" or "not disabled" at step five.

14

20 C.F.R. § 404.1520(a)(4). During steps one through four, the claimant has the burden to prove her disability. See *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (stating that "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five" (citing *Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004))). In step five, the Commissioner has the burden of production to provide evidence that the claimant is not disabled. *Stormo*, 377 F.3d at 806 (stating that the ALJ's duty to develop the record does not relieve the claimant from the burden of persuading the court of her disability (citing *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004))); *see, e.g.*, 20 C.F.R. §§ 404.1512, 404.1560(c)(2), 416.912, and 416.960(c)(2).

During step one, the ALJ determines whether the claimant is gainfully employed. 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently gainfully employed, the claimant is not disabled and the analysis ends. 20 C.F.R. §§ 404.1520(a)(4), 404.1520(b). A claimant is gainfully employed if the claimant is currently engaged in "substantial gainful activity." *See* 20 C.F.R. § 404.1520(b). "Gainful activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b), 416.972(b). Such activity is "substantial" if it involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a).

Regarding Laura F., the ALJ found that she was not engaged in substantial gainful activity at the time she sought disability benefits. Filing 13-2 at 14 (AR 13). The alleged onset date for her disabilities is December 24, 2020. Filing 13-5 at 2, 5, 12 (AR 227, 230, 237). As of this date, the ALJ found claimant had not engaged in substantial gainful activity for two reasons. Filing 13-2 at 14 (AR 13). First, Laura F.'s quarterly earnings record from the fourth quarter of 2020 shows her last wage amount was $5,335. Filing 13-5 at 27 (AR 252). Second, Laura F.

15

received unemployment insurance benefits in the second and third quarters of 2020 and in the first three quarters of 2021. Filing 13-5 at 26-27 (AR 251-252). Since the ALJ found Laura F. was not engaged in substantial gainful activity as of December 24, 2020, the ALJ proceeded to the second step of the analysis.

In step two, the ALJ determines whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment or combination of impairments is "severe" if the claimant's ability to perform "basic work activities" is significantly limited. 20 C.F.R. § 404.1520(c); *see* 20 C.F.R. §§ 404.1522(b), 416.922(b) (defining basic work activities as "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "capacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting"). The impairment or combination of impairments must also satisfy the duration requirement "of at least 12 months." *See* 20 C.F.R. § 404.1509. In contrast, an impairment or combination of impairments is not severe when the evidence the claimant offers establishes only a slight abnormality or a combination of slight abnormalities which has no more than a minimal effect on the claimant's ability to work. *See* Social Security Ruling 85-28; Social Security Ruling 16-3p; *Bowen v. Yuckert*, 482 U.S. 137, 154 (1987).

The ALJ found that Laura F.'s ability to perform basic work activities is limited by severe impairments from degenerative disc disease with a remote history of lumbar spinal fusion surgery, fibromyalgia, obesity, bipolar and depressive disorders, and anxiety disorder, which significantly limit her ability to perform basic work activities. Filing 13-2 at 14 (AR 13); Filing

16

13-3 at 5, 25, 26 (AR 72, 92, 93). Additionally, the ALJ found that Laura F. had secondary impairments, though these impairments did not significantly limit her ability to perform basic work activities. *See* Filing 13-2 at 14 (AR 13) (listing "GERD, obstructive sleep apnea, sinus tachycardia, migraines, osteoarthritis of the knees, degenerative change of the first MTP joint of the left foot, and urinary incontinence" as additional impairments of the claimant); Filing 11-1 at 96, 99-100, 124, 524, 527, 551 (AR 470, 473-474, 498, 898, 901, 925). After determining that Laura F. had severe impairments, the ALJ proceeded to the third step.

During step three, the ALJ determines whether the claimant's impairment or combination of impairments meets the criteria of any Social Security Income listings. 20 C.F.R. § 404.1520(a)(4)(iii). If an impairment "meets or equals one of [the] listings," the claimant is found "disabled." 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). If an impairment is not listed or does not meet or equal one of the impairments on the Social Security Income listings, the analysis proceeds to steps four and five. 20 C.F.R. § 404.1520(a)(4). Generally, to meet or equal one of the listings for physical impairments, the record must include evidence from "a state agency medical or psychological consultant, a medical expert, or a member of the Appeals Council medical support staff" stating a claimant's impairment is listed or meets or equals  a listed impairment. Filing 13-2 at 16 (AR 15) (citing Social Security Ruling 17-2p). To meet or equal one of the listings for mental impairments, the claimant must provide evidence that either the impairment "result[s] in one extreme limitation or two marked limitations in a broad area of functioning" or that the claimant "has only [a] marginal adjustment." Filing 13-2 at 17 (AR 16)*; see, e.g.*, Social Security Administration, *Disability Evaluation Under Social Security 12.00 Mental Disorders – Adult*, https://www.ssa.gov/disability/professionals/bluebook/12.00-

MentalDisorders-Adult.htm. An "extreme limitation" means the claimant is unable "to function in this area independently, appropriately, effectively, and on a sustained basis." *Id.* A "marked limitation" means the claimant's ability to function "in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." *Id.* A "marginal adjustment" means the claimant has only "a minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." *Id.*

Relying on the list of severe impairments that did impact Laura F.'s ability to perform work activities from the previous step, the ALJ determined that none of these physical or mental impairments meets or equals any of the impairments listed in the Social Security Income Listings. Filing 13-2 at 16 (AR 15). Regarding Laura F.'s physical impairments, the ALJ emphasized that there was no evidence from "a state agency medical or psychological consultant, a medical expert, or a member of the Appeals Council medical support staff that would find" an equivalent to the severe physical impairments listed. Filing 13-2 at 16 (AR 15) (citing Social Security Ruling 17-2p). Regarding Laura F.'s mental impairments, the ALJ found Laura F. had "mild limitation[s]" concerning "understanding, remembering, or applying information" as well as "in interacting with others." Filing 13-2 at 17 (AR 16); Filing 13-3 at 8, 27 (AR 75, 94). The ALJ also found that Laura F. had "moderate limitation[s]" concerning "concentrating, persisting, or maintaining pace" as well as "adapting and managing oneself." Filing 13-2 at 17-18 (AR 16-17); Filing 13-3 at 5 (AR 72). However, these mild and moderate limitations do not meet or equal "two 'marked' limitations or one 'extreme' limitation" nor do these limitations—considered along with Laura F.'s testimony and the record—suggest that Laura F. has a marginal

adjustment. Filing 13-2 at 19 (AR 18). Thus, the ALJ could not find Laura F. disabled under step

three of the analysis, so the ALJ proceeded to step four.

### 4. *The ALJ's Residual Functional Capacity Findings*

In step four, the ALJ determines whether the claimant's impairment or combination of

impairments prevents the claimant from performing "past relevant work." 20 C.F.R.

§ 404.1520(a)(4)(iv). *See* 20 C.F.R. §§ 404.1565(a), 416.965(a) ("Past relevant work" refers to

work the claimant performed "long enough [to learn] to do" fifteen years prior to or within

fifteen years of the date the disability was established). Based on the objective medical evidence

and other evidence the claimant provides in the record, if the ALJ finds the claimant can perform

past relevant work, the claimant is not disabled, and the analysis does not proceed to step five.

*See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f). If the ALJ finds the claimant cannot perform

past relevant work, then the analysis proceeds to step five to determine whether the claimant is

disabled. 20 C.F.R. § 404.1520(h). The ALJ determines a claimant's ability to perform past

relevant work by calculating the claimant's RFC. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(e);

*see, e.g.*, 20 C.F.R. § 404.1545. A claimant's RFC is the "the most [a claimant] can still do [in a

work setting] despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ uses

both severe and non-severe impairments when calculating a claimant's RFC. 20 C.F.R.

§ 404.1545(a)(2).

The ALJ used the severe and non-severe impairments from step two to calculate Laura

F.'s RFC. Filing 13-2 at 15 (AR 14). From the evidence in the record, the ALJ found that Laura

F. has the RFC to perform "light work . . . except with an ability to occasionally climb ladders,

ropes, or scaffolds, ramps or stairs, balance, kneel, stoop, crouch, and crawl, but should have no

concentrated exposure to temperature extremes, wetness, loud noise, vibration, and hazards such as unprotected heights or close proximity to dangerous moving mechanical parts." Filing 13-3 at 7 (AR 74); Filing 13-2 at 19 (AR 18) (citing 20 C.F.R. §§ 404.1567(b), 416.967(b)). Consistent with her ability to perform light work, the ALJ found Laura F. is able to understand, follow, and complete simple, repetitive routine tasks and instructions in jobs that have no more than occasional changes in the work setting. Filing 13-3 at 8-9 (AR 75-76); Filing 13-2 at 66 (AR 65). As such, the RFC shows that Laura F. is capable of performing her past relevant work as a cashier. Filing 13-2 at 66 (AR 65). Since Laura F. can perform past relevant work, the ALJ has not yet found her disabled, and while the ALJ could have concluded the analysis at this step, the ALJ proceeded to the fifth step to show "alternative findings." Filing 13-2 at 26 (AR 25).

### 5.   The ALJ's Findings Regarding Ability to do Other Work

In step five, the ALJ must determine whether the claimant's impairment or series of impairments prevents the claimant from performing any other work given the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1520(h). In this step, the burden of proof shifts to the Commissioner to prove the claimant is not disabled because the claimant can perform other work despite the claimant's impairments or combination of impairments. 20 C.F.R. §§ 404.1512(b)(3), 404.1560(c), 416.912(b)(3), 416.960(c). Specifically, the Commissioner must "provid[e] evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do." 20 C.F.R. §§ 404.1512(b)(3), 404.1560(c), 416.912(b)(3), 416.960(c). The ALJ then considers this evidence "in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2." Filing 13-2 at 27 (AR 26). If the claimant "cannot perform substantially all the exertional

demands of work at a given level of exertion or has non-exertional limitations, the medical-vocational rules are used as a framework . . . unless . . . a rule [ ] directs a conclusion of 'disabled.'" Filing 13-2 at 27 (AR 26) (citing *Titles II & XVI: Capability to do Other Work-Themedical-Vocational Rules as a Framework for Evaluating Exertional Limitations within a Range of Work or Between Ranges of Work*, SSR 83-12 (S.S.A. 1983) and (*Titles II & XVI: Capability to do Other Work-Themedical-Vocational Rules as a Framework for Evaluating a Combination of Exertional & Nonexertional Impairments*, SSR 83-14 (S.S.A. 1983)).

The ALJ found that Laura F. can perform other jobs that exist in significant numbers in the national economy such as a pricer and an office helper. Filing 13-2 at 67 (AR 66). The ALJ reached this conclusion after consulting with a vocational expert about Laura F.'s limitations. Filing 13-2 at 63-64 (AR 62-63). Specifically, the ALJ asked the vocational expert what jobs, other than Laura F.'s prior work as a cashier, exist in the national economy for an individual with the claimant's age, education, work experience, and RFC. Filing 13-2 at 66 (AR 65). The ALJ posed this question because Laura F.'s "ability to perform all or substantially all the requirements" at her RFC's light level of exertion "has been impeded by additional limitations," and therefore, a direct conclusion of disabled or not disabled without exploring the impact of these limitations would have been improper. Filing 13-2 at 27 (AR 26); Filing 13-2 at 66 (AR 65). The vocational expert answered that there are 145,000 jobs as a pricer and 260,000 jobs as an office helper that are available to Laura F. Filing 13-2 at 67 (AR 66). Finding both jobs to be consistent with the Dictionary of Occupational Titles, the ALJ concluded the five-step analysis, holding that Laura F. is not entitled to disability benefits because she is not disabled. Filing 13-2 at 67 (AR 66).

21

## II. LEGAL ANALYSIS

### A. Standard of Review

A claimant is entitled to judicial review in federal district court after seeking review of any final ALJ decision by the Appeal's Council. *Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019); *see also* 42 U.S.C. § 405(g). The Court reviews a denial of benefits by the Commissioner *de novo* to determine if the ALJ's findings are supported by substantial evidence in the record as a whole. *Swarthout v. Kijakazi*, 35 F.4th 608, 610 (8th Cir. 2022) (citing *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016)); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))); *see also Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010) (stating that "[s]ubstantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision" (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006))). If so, the Court affirms the ALJ's holding. *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). In its review, the Court defers heavily to the ALJ's findings by "view[ing] the record in light most favorable to [the ALJ's] determination." *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018). However, the Court will consider "evidence that detracts from the [ALJ's] decision, as well as evidence that supports it." *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (citing *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007)).

In addition to determining whether the ALJ's findings are supported by substantial evidence, the Court must determine whether the ALJ's decision "complies with the relevant legal

standards." *Lucus v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (internal citations omitted)). A legal error may consist of "an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Lucus*, 960 F.3d at 1068 (quoting *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011)); *see also Collins*, 648 F.3d at 871 (finding the ALJ committed a legal error because the ALJ did not pose a hypothetical question to the vocational expert).

## B.  Discussion

As stated in the factual background, Laura F. asserts three grounds for the Court to reverse or vacate and remand the ALJ's decision. First, she argues that the ALJ did not articulate sufficient reasons for finding the opinion of Ms. Millemon only "partially persuasive" concerning Laura F.'s physical limitations. Filing 18 at 2;*see* Filing 13-2 at 25 (AR 24) (stating that the ALJ finds Ms. Millemon's opinions "partially persuasive"). Second, she argues that the ALJ did not fully and fairly develop the record because the residual functional capacity (RFC) lacks sufficient medical support regarding Laura F.'s mental limitations Filing 18 at 2-3. Third, she argues that the ALJ's decision is invalid because the ALJ was not constitutionally appointed at the time of the ALJ hearing since the Commissioner was not validly serving at the time of the ALJ's appointment. Filing 18 at 3. The Court will consider Laura F.'s grounds for reversal or remand in turn.

### 1.  *Substantial Evidence Supports the ALJ's Determination that Ms. Millemon's Medical Opinion was Only "Partially Persuasive."*

Laura F. is correct to assert that the ALJ's RFC finding must ordinarily be supported by treating or examining source opinions for the finding to be supported by substantial evidence. *Compare Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (stating that "[a] treating

physician's opinion is generally entitled to substantial weight, . . . [but it] must be supported by medically acceptable clinical or diagnostic data") *and Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (2000) (stating that "[a] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided that the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record'" (citing 20 C.F.R. § 404.1527(c)(2))), *with Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (stating that "treating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant cannot be gainfully employed, because they are merely 'opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]'" (quoting *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002) (citation omitted) (alteration in original)) *and Myers v. Colvin*, 721 F.3d 521, 525 (8th Cir. 2013) (stating that "[a] treating source's opinion is not 'inherently entitled' to controlling weight" (quoting *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006))); 20 C.F.R. § 404.1527(d)). However, Laura F. incorrectly asserts that the ALJ has a duty to obtain further medical expert opinions if the ALJ discounts the treating or examining source opinion. *See* 20 C.F.R. § 404.1545(a)(3).

The ALJ's duty is to develop the record "fully and fairly" so that there are sufficient facts to support the ALJ's decision. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). To develop the record, the ALJ "make[s] every reasonable effort to help [the claimant] get medical evidence from [the] medical sources and entities" supplied by the claimant. 20 C.F.R. § 404.1512(b)(1). A court may direct an ALJ to review medical opinions and records, but a court does not order an ALJ to obtain further evidence such as ordering additional tests. *Compare* 20 C.F.R. §§

404.1517-404.1519t  (containing permissive language outlining the ALJ's discretion to request a claimant to partake in a consultative examination), *with Garza v. Barnhart*, 397 F.3d 1087, 1089-90 (8th Cir. 2005) (stating that because the ALJ improperly considered whether the claimant's fibromyalgia diagnosis was a severe impairment by not obtaining medical records from the claimant's rheumatologists that the ALJ must obtain the records and may "pose a revised hypothetical to a [vocational expert]" after further developing the record) *and Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2022) (stating that an ALJ was obliged to contact the claimant's long-time treatment doctor to clarify the doctor's entries and opinion because the entries and opinion were "cursory"). The burden of supplying the ALJ with sufficient medical opinions and records to make an informed decision lies with the claimant and the claimant's representative. 20 C.F.R. § 404.1740(b)(1); 20 C.F.R. § 404.1512(a); see also *Bowen v. Yuckert*, 482 U.S. 137 (1987) (discussing that claimant is in a better position to offer medical opinions and records about the claimant's position). For the ALJ to fulfill his or her obligation of "fully and fairly" developing the record, the ALJ does not have a duty to acquire evidence beyond what was supplied by the claimant. *Stormo*, 377 F.3d at 806 (stating that the ALJ does not have a duty "to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped" (citing *Snead*, 360 F.3d at 839)); *see, e.g.*, *Jones v. Astrue*, 619 F.3d 963, 969 (2010) (explaining that a treating physician's statement may be undeveloped "when the report from [a] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or [the report] does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques" (quoting *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)) (citing 20 C.F.R. §§ 404.1512(e), 416.912(e))).

When assessing such opinions and findings supplied by the claimant, the ALJ may discount or disregard opinions and findings so long as the ALJ explains the rationale. *Garza*, 397 F.3d at 1089 (stating that an ALJ may discount the opinion of a treating physician if the opinion is inconsistent with the physician's treatment records (citing *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001))); *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995) (discussing that an "ALJ may reject the conclusions of any medical expert, whether hired by a claimant or by the government, if [the conclusions are] inconsistent with the medical record as a whole"). Specifically, the ALJ relies upon five factors to view all medical opinions and prior administrative medical findings supplied by the claimant: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; (5) other factors. 20 C.F.R. § 404.1520c(c). Of these five factors, the two most important factors—and the only factors that must be discussed in the ALJ's decision—are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2); *see, e.g.*, 20 C.F.R. § 404.1520c(b)(3) (stating that if "two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported and consistent with the record but are not exactly the same, [the court] will articulate . . . the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section").

A medical opinion is supported if "the objective medical evidence and supporting explanations" used in the opinion substantiate the findings. 20 C.F.R. § 404.1520c(c)(1). However, a physician's statement asserting that a claimant has "an extremely difficult time managing" a condition without any explanation of how the doctor defines "extremely difficult" is conclusory. *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996) (stating that the opinion of a treating physician "deserves no greater respect than any other physician's opinion when the

26

treating physician's opinion consists of nothing more than vague, conclusory statements"). A medical opinion is consistent if the opinion expresses similar agreement to "the evidence from the other medical and non-medical sources of the claim." 20 C.F.R. § 404.1520c(c)(2). However, a physician's opinion that a claimant has limited mobility is inconsistent when the claimant's other physicians placed "few if any functional limitations" on the claimant. *Hensley v. Barnhart, 352 F.3d 353, 356 (8th Cir. 2003)*. If a treating physician's opinion is not supported or is inconsistent with the record, the ALJ may discredit this opinion when calculating the claimant's RFC. *See Grindley v. Kijakazi, 9 F.4th 622, 632-33 (8th Cir. 2021)* (stating that the treating physician's opinion which consisted of a "check-box" sheet of symptoms was properly not given much weight by the ALJ because, in addition to being conclusory since there was no explanation whether the checked symptoms meant the claimant was disabled, the opinion was inconsistent with the other medical opinions which stated that the claimant's symptoms were "treatable with medication").

When evaluating Ms. Millemon's opinions concerning Laura F.'s physical limitations, the ALJ found Ms. Millemon's statements that "[Laura F.] can stand and walk for about 10-15 minutes at a time," that Laura F. "[s]hould avoid uneven terrain and use a rail when using stairs," and that Laura F. "can sit about 20 minutes at a time" were not supported by nor consistent with other medical evidence in the record. Filing 11-1 at 514 (AR 888). These statements are not supported in the record because in the same evaluation Ms. Millemon notes that Laura F.'s "[g]ait is normal," that "[n]o devices are used," and that Laura F. "did not have difficulty getting on and off the exam table." Filing 11-1 at 512, 513, 518 (AR 886, 887, 892). Furthermore, Ms. Millemon's statements are not consistent with the rest of the record because the other medical

sources do not place similar limitations on Laura F.'s ability to stand, walk, and sit. Filing 11-1 at 116, 297 (AR 490, 671). *See* Filing 11-1 at 548 (AR 922) (stating that Laura F. walks for exercise).

In its *de novo* review, the Court concludes that there is substantial evidence supporting the ALJ's finding that Ms. Millemon's opinion was only partially persuasive. Filing 13-2 at 25 (AR 24). *See Swarthout v. Kijakazi*, 35 F.4th 608, 610 (8th Cir. 2022) (discussing that the *de novo* standard of review involves determining whether the ALJ's findings are supported by substantial evidence in the record as a whole (citing *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016))). First, the ALJ had no duty to obtain a further medical report upon discounting Ms. Millemon's opinion prior to determining the claimant's physical limitations when calculating the claimant's RFC. Filing 13-2 at 25 (AR 24). Second, Ms. Millemon's opinions that Laura F. could only "stand and walk for about 10-15 minutes at a time" and could only "sit about 20 minutes at a time" were not supported by explanations in Ms. Millemon's notes nor were Ms. Millemon's opinions consistent with those of other medical opinions in the record. Therefore, the Court rejects the claimant's argument that the ALJ did not articulate sufficient reasons for discounting the physical limitations expressed in Ms. Millemon's opinion.

### 2. *Substantial Evidence Shows that the ALJ Adequately Developed the Record and Accounted for Laura F.'s Proven Limitations*

The ALJ properly determined Laura F.'s RFC when evaluating Laura F.'s proven limitations and subjective allegations of limitations. A claimant's subjective complaints "play a role" in assessing a claimant's RFC. *Ellis v. Barnhart*, 392 F.3d 988, 995-96 (8th Cir. 2005) (citing *Pearsall v. Massanari*, 274 F.3d 1211, 1217-18 (8th Cir. 2001)). However, the ALJ is entitled to determine the credibility of a claimant's subjective complaint by using the multi-

factor test set forth in *Polaski v. Heckler*. *Grindley v. Kijakazi*, 9 F.4th 622, 630 (8th Cir. 2021).
The factors include (1) the claimant's daily activities; (2) the duration, frequency, and intensity
of the claimant's pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness,
and side effects of the claimant's medication; and (5) functional restrictions. *Polaski v. Heckler*,
739 F.2d 1320, 1322 (8th Cir. 1984); *see, e.g., Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th
Cir. 2009) (stating that another factor to assess the credibility of the claimant's subjective
complaint—though this factor cannot be the sole reason to discount the complaint—is the
absence of objective medical evidence to support the claimant's complaint (citing *Mouser v.
Astrue*, 545 F.3d 634, 638 (8th Cir. 2008))). When assessing these factors, an ALJ "is not
required to discuss each *Polaski* factor . . . before discounting a claimant's subjective
complaints." *Halverson*, 600 F.3d at 931-32 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th
Cir. 2009)). After assessing the subjective complaint under the *Polaski* factors, an ALJ may
discount the claimant's subjective claim if "the objective evidence outweigh[s]" the subjective
claim. *Grindley v. Kijakazi*, 9 F.4th 622, 631 (8th Cir. 2021). *Compare Rainey v. Bowen*, 814
F.2d 1279, 1281 (8th Cir. 1987) (stating that while "the absence of objective medical evidence to
support an allegation of disabling pain is but one factor used to evaluate the applicant's
credibility . . . a subjective complaint of pain may not be disregarded on the sole basis that there
is no supporting objective evidence") (internal citations omitted), *with Lowe v. Apfel*, 226 F.3d
969, 972 (8th Cir. 2000) (stating that the "ALJ may not discount a claimant's complaints solely
because they are not fully supported by the objective evidence, but the complaints may be
discounted based on inconsistencies in the record as whole").

Because there is a subjective complaint concerning the duration for which Laura F. can walk and sit, a case comparison is warranted. The court in *Ellis v. Barnhart* found the claimant's "subjective complaints of the severity of his symptoms and limitations to not be fully credible" because there was a lack of objective medical evidence and treatment history "support[ing] his allegations." 392 F.3d 988, 993 (8th Cir. 2005). The *Ellis* court found that the claimant's subjective complaints related to problems with his "back, particularly degenerative disc disease, and his inability to sit or stand in one position for any period of time" were inconsistent with the rest of the record. *Id.* at 991. When analyzing the *Polaski* factors generally, the *Ellis* court first found evidence in the record indicating that the claimant's pain was alleviated by medication and that the claimant did not have "adverse side effects from the medication." *Id.* at 996. Second, the *Ellis* court found that the record indicated that no doctor "observed signs consistent with the limited lifestyle" the claimant described. *Id.* Third, even though claimant "walked with part-time assistance of a cane," the record indicated that the cane "was not medically necessary," which was proven in part by the claimant "'walk[ing] briskly' . . . [and] ha[ving] no problems getting around the examining room." *Id.* at 992, 995. Fourth, despite the claimant's assertions that he could "sit only for a limited time," the record revealed inconsistent evidence because the claimant spent his time sitting when he watched television as well as read. *Id.* at 995. Finally, despite the claimant's assertions that he had severe back and hip pain which "prevent[ed] him from sitting or standing for any length of time," the record revealed the claimant had "normal, or near normal, range of motion in his shoulders, hips, cervical spine, and lumbar spine." *Id.* at 996. Since the *Polaski* factors weighed against the credibility of the claimant's subjective complaints, the *Ellis* court did not find such complaints credible. *Id.* at 993, 996. *Compare with Osborne v.*

30

*Colvin*, 95 F. Supp. 3d 1147, 1153, 1167, 1169 (D. Neb. 2015) (finding that the ALJ's decision was not supported by substantial evidence in part because the ALJ's conclusion that "because [the claimant] can go to the grocery store, he is able to function in select social situations" conflicts with the rest of the record which included the claimant's testimony that he only went to the store "once a month in the middle of the night when the least amount of people are going to be there" to avoid crowds due to his subjective complaint of anxiety reactions).

The ALJ properly discounted Laura F.'s subjective complaints when calculating her RFC because her subjective complaints were not credible. First, the ALJ considered Laura F.'s daily activities as well as the duration, frequency, and intensity of her pain. Filing 13-2 at 23 (AR 22). The ALJ found inconsistencies between Laura F.'s complaints of her mental and physical pain with her daily activities. Filing 13-2 at 23 (AR 22). Beginning with complaints of her mental pain, Laura F.'s statements that she "can't deal with people, [she] can't go to crowds," and that she does not "want to get out of bed" every day are inconsistent with evidence that she was able to be "around unfamiliar or large groups of people" while traveling in Mexico and Colorado and that she feeds her cat, waters her plants, and goes to stores multiple times a week if not daily. Filing 13-2 at 23, 53, 59, 60 (AR 22, 52, 58, 59); Filing 13-6 at 37 (AR 288). Additionally, Laura F.'s statements that her anxiety is brought on by people and is worsened by "not having money to pay bills" is inconsistent with  evidence that Laura F. had "no significant problems handling money, shopping in stores, and spending time with others." Filing 13-2 at 23, 60, 62-63 (AR 22, 59, 61-62); Filing 13-6 at 70, 72, 83, 85 (AR 321, 323, 334, 336).

Concerning Laura F.'s complaints of her physical pain, as in *Ellis*, the ALJ found inconsistencies in Laura F.'s complaints of her physical pain. Filing 13-2 at 23 (AR 22). First,

Laura F.'s complaints that she cannot sit for long durations at a time are inconsistent with evidence that she is able to sit to watch television daily, that she drives herself to appointments and to see friends, and that she was able to sit during her drive from Nebraska to Colorado and her flight to Mexico. Filing 13-6 at 35, 38 (AR 286, 289); Filing 13-2 at 50, 53, 56 (AR 49, 52, 55). Second, Laura F.'s complaints that she can only walk "10 steps at most" and she can only stand for "probably ten minutes," Filing 13-2 at 50 (AR 49), are inconsistent with evidence that she has lost five pounds by walking. Filing 13-2 at 23 (AR 22) ("In January 2022, the claimant was noted has [sic] losing five pounds, reporting that she was walking and trying to keep active, which suggests the claimant was walking more than 10 steps at a time."); Filing 12-1 at 129 (AR 1072) ("She has lost about 5 pounds. She has been walking and trying to keep active."). Third, Laura F.'s complaints that she uses a cane to "keep steady" is inconsistent with evidence that Laura F. can walk without the use of this cane, that is, for much the same reason a cane was not deemed medically necessary in *Ellis*. Filing 13-6 at 73 (AR 324); Filing 12-1 at 260, 263, 266 (AR 1203, 1206, 1209).

The ALJ then assessed the dosage, effectiveness, and side effects of the claimant's medication prescribed for her proven limitations. Filing 13-2 at 23-24 (AR 22-23). The ALJ found that despite the claimant's subjective complaints that Tylenol and Tramadol would provide "a little bit of relief . . . [but] doesn't do anything," treatment notes show that the medications were effective and that Laura F. "even specifically requested it." Filing 13-2 at 23, 50 (AR 22, 49). The treatment notes also show that while the claimant takes some medications daily, others such as Xanax are taken on an as-needed basis. Filing 11-1 at 84, 98-99, 124, 163-164 (AR 458, 472-473, 498, 537-538). Overall, the treatment notes reveal that Laura F. has "minimal side

32

effect problems" from her various medications she takes for treatment, attributing her "moderate" symptoms mostly to her anxiety and depression. Filing 11-1 at 83, 231, 294, 298, 310, 314 (AR 457, 605, 668, 672, 684, 688). Furthermore, despite Laura F.'s complaints that gabapentin and Lyrica helped her fibromyalgia "not very much," there was an increase in gabapentin dosage following a period of not taking the medication. Filing 13-2 at 49 (AR 48); *compare* Filing 11-1 at 441 (AR 815) *with* Filing 11-1 at 443 (AR 817) *and* Filing 11-1 at 446 (AR 820). Another medication which proved to be effective was prednisone. Filing 11-1 at 130, 526 (AR 504, 900). Despite the record noting adjustments of dosages and limited frequency and duration of taking prednisone in particular, the ALJ reiterated the record reveals that Laura F. had "minimal medication side effects." Filing 13-2 at 24 (AR 23).

The ALJ also considered treatment of Laura F.'s depression with ECT. Filing 13-2 at 51 (AR 50). The ALJ found these treatments were effective in part because the claimant has received them regularly since 2020, "for two and a half years." Filing 13-2 at 51 (AR 50). While Laura F. asserts that a side effect of ECT is an impact on her memory and that her depression is "still bad," the ALJ found clinical observations and mental status exam findings listing improvements in her depression which were "inconsistent" with Laura F.'s subjective complaints. Filing 13-2 at 24, 59-60 (AR 23, 58-59); Filing 11-1 at 122 (AR 496); Filing 13-3 at 38-39 (AR 105-106).

Regarding the ECT treatments, the claimant suggests the ALJ had a duty to order a neuropsychology consultation to determine how her ECT impacts her cognitive ability. Filing 18 at 3. As discussed in the previous section, the claimant and claimant's representative have the burden of supplying the ALJ with sufficient medical opinions and records to make an informed

decision. 20 C.F.R. § 404.1740(b)(1); 20 C.F.R. § 404.1512(a); *Stormo*, 377 F.3d at 806. Furthermore, an ALJ may, but is not required to, have a claimant attend a consultative examination. 20 C.F.R. § 404.1512(2). If the claimant wanted the ALJ to evaluate the impact of the claimant's ECT aside from her subjective complaints, then the claimant could have provided medical tests of that impact as part of her duty to supply the ALJ with sufficient medical opinions and records. 20 C.F.R. § 404.1740(b); 20 C.F.R. § 404.1512(a). Without such information supplied from the claimant, the ALJ acted pursuant to the *Polaski* factors when discounting the claimant's subjective complaints. Filing 13-2 at 21 (AR 20). In doing so, the ALJ properly calculated Laura F.'s RFC.

This Court finds in its *de novo* review that there is substantial evidence that the ALJ properly calculated Laura F.'s RFC and properly determined that, given her RFC, she can perform light work including past relevant work as a cashier as well as other work as a pricer or an office helper. See *Swarthout v. Kijakazi*, 35 F.4th 608, 610 (8th Cir. 2022) (discussing that the *de novo* standard of review involves determining whether the ALJ's findings are supported by substantial evidence in the record as a whole (citing *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016))). Additionally, the ALJ properly evaluated Laura F.'s mental limitations given the opinions she provided to the ALJ for the ALJ to make a determination of her disability benefits. Therefore, the Court rejects Laura F.'s argument that the ALJ did not fully and fairly develop the record concerning her mental limitations.

### 3. The Appointment of the ALJ was Constitutional

Both parties have properly identified *Dahle v. Kijakazi*, 62 F.4th 424 (8th Cir. 2023), as controlling on the issue of whether Nancy Berryhill was validly serving as Acting Commissioner

when she ratified and approved ALJ Chris Yokus's appointment. Filing 22 at 12; Filing 18 at 25; Filing 23 at 10. Because the claimant raised this issue simply to preserve it, *see* Filing 18 at 25-26, the Court's analysis can be brief. Under *Dahle*, Nancy Berryhill was properly serving as Acting Commissioner when she appointed Chris Yokus as an ALJ and therefore, ALJ Yokus was constitutionally appointed at the time he denied Laura F. benefits.

An Administrative Law Judge (ALJ) is an inferior officer who may be appointed by the President of the United States, courts, or department heads, such as the Acting Commissioner. *Sidney M. v. Kijakazi*, 630 F. Supp. 3d 1077, 1097 (N.D. Iowa 2022) (citing U.S. Const., art. II, § 2, cl. 2); *see generally*, *Lucia v. S.E.C.*, 585 U.S. 237 (2018) (discussing how to determine whether a government employee is a principal officer and thus entitled to be nominated by the President and confirmed by the Senate). Under the Federal Vacancies Reform Act of 1998 (FVRA), an individual must be filling a vacant office in compliance with 5 U.S.C. §§ 3345, 3346, or 3347, otherwise "the performance of any function or duty of a vacant office . . . shall have no force or effect." *Sidney M.*, 630 F. Supp. 3d at 1097 (quoting 5 U.S.C. § 3348(d)(1)). Under *Dahle*, an individual serving as Acting Commissioner via a presidential succession memo has been directed to serve by the President, in compliance with 5 U.S.C. § 3345 of the FVRA. *Dahle*, 62 F.4th at 429 (stating that "'the President (and only the President) may direct' an agency employee to serve in an acting capacity" (quoting 5 U.S.C. § 3345(a)(3)). President Obama's 2016 Presidential Memorandum "providing an order of succession for SSA officials to serve as Acting Commissioner under the FVRA" is an example of a succession memo. *Sidney M.*, 630 F. Supp. 3d at 1098; Presidential Memorandum Providing an Order of Succession Within the Social Security Administration, 81 Fed. Reg. 96337 (Dec. 23, 2016). The *Dahle* court

held that an individual who filled the vacancy of Acting Commissioner via President Obama's succession memo would remain Acting Commissioner despite not having been nominated by the President and confirmed by the Senate. *Dahle*, 62 F.4th at 426, 429; *see, e.g.*, *Sidney M.*, 630 F. Supp. 3d at 1098 (stating that a succession memo "remain[s] in effect through different presidencies until replaced, modified, revoked, or lapse by [its] terms" (referring to *Bauer v. Kijakazi*, Case No. 21-CV-2008-KEM, 2022 WL 2918917, at *2 (N.D. Iowa July 25, 2022)) (citation omitted). Therefore, this individual would be a department head with the authority to appoint inferior officers, such as ALJs. *See Sidney M.*, 630 F. Supp. 3d at 1097 (citing U.S. Const., art. II, § 2, cl. 2).

Berryhill filled the vacancy of the Social Security Administration Commissioner on January 21, 2017. *Sidney M.*, 630 F. Supp. 3d at 1098. She assumed this office via President Obama's succession memo. *Id.*; *Dahle*, 62 F.4th at 427. Berryhill served in this capacity with a brief interruption, resuming this position in April of 2018 after "President Trump submitted a nomination for SSA Commissioner to the Senate." *Dahle*, 62 F.4th at 427. Berryhill appointed Chris Yokus as ALJ in 2017. Disability Judges, Administrative Law Judge Case Statistics, https://www.disabilityjudges.com/judge/chris-yokus/. Since Berryhill was Acting Commissioner at the time she appointed ALJ Yokus, ALJ Yokus was constitutionally appointed at the time he denied Laura F. benefits. Therefore, the Court rejects the claimant's argument that because the ALJ not being constitutionally appointed at the time of issuing his opinion the ALJ's decision is invalid.

## III. CONCLUSION

The Court concludes that substantial evidence supports the ALJ's decision that Laura F. is not disabled and therefore not entitled to disability insurance benefits nor supplemental security income. The Court also concludes that the ALJ was constitutionally appointed. Accordingly,

IT IS ORDERED that

1.      Claimant's motion is denied;

2.      The Commissioner's motion is granted;

3.      The Commissioner's decision is affirmed;

4.      The Court will enter a separate judgment.


Dated this 7th day of May, 2024.

BY THE COURT:

Brian C. Buescher
United States District Judge

37